UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |  |
|---|---|---|
| JOHN DENEHY,<br>    Plaintiff | ) <br> ) <br> ) | |
| v. | ) <br> ) | COMPLAINT |
| MASSACHUSETTS PORT AUTHORITY, and<br>SWISSPORT FUELING INC.<br>    Defendants. | ) <br> ) <br> ) <br> ) | C.A. No. 13-12473 |

INTRODUCTION

1. Plaintiff represents individuals who rely on the natural resources found in Boston Harbor, namely soft-shell clams, for their livelihoods. He brings this action on his and their behalf for losses and damages arising out of the jet fuel spill that occurred at Logan International Airport on or about October 7, 2010, leading to discharge of fuel into the surrounding waters.

PARTIES

2. The plaintiff, John Denehy, is the representative party, pursuant to Fed. R. Civ. P. 23.2, of the Boston Clamdiggers Association (hereinafter "BCA"), an unincorporated association of individual clamdiggers located in Massachusetts. Denehy is head of and spokesperson for the BCA, which is comprised of Massachusetts residents who harvest clams from Boston Harbor's clam beds, including beds on the shores of Logan Airport. Denehy is capable of fairly and adequately protecting the interests of the BCA and its members.

3. The defendant, Massachusetts Port Authority (hereinafter "Massport"), is a body politic and corporate pursuant to Chapter 465 of the Acts of 1956, as amended, with its

1

        administrative offices located at One Harborside Drive, East Boston, Massachusetts, and at all times relevant to this action controlled Logan International Airport in East Boston, Massachusetts (hereinafter "Logan").

4. The defendant, Swissport Fueling Inc. (hereinafter "Swissport"), is a Delaware corporation with a principal office at 45025 Aviation Drive, Suite 350, Dulles, Virginia, and at all relevant times to this complaint was responsible for fueling aircraft at Logan Airport in East Boston, Massachusetts.

## JURISDICTION AND VENUE

5. Jurisdiction is appropriate under 28 U.S.C. §§ 1331 (Federal question), 1333 (Admiralty), and 33 U.S.C. §2717(b) (the Oil Pollution Act, hereinafter "OPA").

6. Venue is proper under 28 U.S.C. §1391(b)(2) and 33 U.S.C. §2717(b) because the discharge giving rise to this claim occurred in this district.

## GENERAL ALLEGATIONS

7. The members of the BCA (hereinafter "clammers") are commercial clammers who are duly licensed by the Commonwealth of Massachusetts Division of Fish and Game, Department of Marine Fisheries, to harvest clams from Boston Harbor.

8. The clammers are further licensed by Massport to harvest shellfish within the security perimeter surrounding Logan Airport, where public access is otherwise prohibited.

9. Several clam beds in Boston Harbor directly abut Logan Airport, including the "Airport," the "Governors Island" and the "Wood Island" beds (collectively, the "Logan Beds").

10. The Logan beds were very productive. Two beds in particular, "Airport" and "Wood Island," were more productive than the rest of the beds in Boston Harbor combined. Between 2005 and 2010, they produced an annual average harvest of 3,145 racks of

clams, worth $202,420.00.

11. In addition, the Logan beds were a reliable source of income to clammers because they were less frequently affected by "rainfall closures." Most beds in Boston Harbor are closed for a period of time following rainfall exceeding ¼ inch. But the Logan beds stayed open unless more than ½ inch of rain fell.

12. On or about August 6, 2010, the clammers dug clams from the Wood Island beds with good results. The Logan clambeds were then closed and the clammers dug in other areas.

13. On or about October 7, 2010, an unknown quantity of jet fuel spilled into Boston Harbor through the North Outfall. The North Outfall is a drain leading from the airport to the harbor, located on the premises of Logan Airport, within Massport's custody and control. Cleanup personnel removed approximately 463 gallons of fuel/water mixture from the area near the North Outfall.

14. Upon information and belief, the spill was caused when an agent of Swissport chose to "jam the dead man" while fueling an airplane at Logan Airport. The "dead man" is a safety device which stops the flow of fuel when the person pumping lets go of the nozzle. "Jamming the dead man" is a practice by which the person pumping fuel disables the safety device, allowing fuel to flow unattended. Upon information and belief, the spill occurred when a Swissport employee left a jammed pump unattended.

15. On or about November 5, 2010, jet fuel was discovered again at the North Outfall. This release was believed to be related to the October 7, 2010 release.

16. On or about November 12, 2010, upon returning to the reopened airport flats, clammers notified the Massachusetts Division of Marine Fisheries that the "Wood Island" and the nearby "Constitution Beach" clam beds were totally devoid of any living soft-shell clams.

17. Logan bed clam landings plummeted. For example, 2011 landings from "Wood Island" numbered only about 49 racks, a 94% decrease from the 881 racks harvested in 2010. Similarly, 2011 landings from "Airport" were 499 racks, an 83% decrease from the 2,990 racks harvested in 2010.

18. This trend continued and worsened in 2012 and 2013. In a 2013 internal email, one official from the Massachusetts Division of Marine Fisheries stated, "there is virtually nothing of consequence left to dig in Boston Harbor."

19. The death of soft-shell clams around Logan Airport has caused and will continue to cause substantial loss of sustenance, loss of revenue, and loss of earning capacity to individuals who cannot dig clams to make a living.

20. The lack of productive clamming in Boston Harbor has caused the Newburyport, Massachusetts clam processing facility to become unprofitable, making it a likely target for closure by the state legislature. The closure of the processing plant, which provides necessary services to bring Massachusetts clams to market, would further imperil clamming in the Commonwealth.

21. Massport met with Denehy and other clamdiggers to discuss the effects of the spill in a meeting on March 2, 2011. At that meeting and elsewhere the defendants have tried to downplay and conceal the severity of the spill and the effect it has had on local soft-shell clam populations. The defendants have still not publicly reported the amount of fuel that was spilled during the event in question.

22. The United States Coast Guard investigated the spill in October 2010 as the federal on-scene coordinator. The Coast Guard pollution investigators, upon information and belief, did not designate any responsible party at that time.

23. On August 13, 2013, in response to presentment of claims to the National Pollution Funds Center, the United States Coast Guard designated Massport and Swissport as responsible parties.

24. On September 12, 2013, in response to the designation of responsible parties, BCA members served claims on Massport and Swissport.

## COUNT I
### GENERAL MARITIME LAW- NEGLIGENCE

25. Each and every allegation set forth above is realleged and reincorporated herein.

26. Defendants owed a duty to plaintiff and other members of Boston Clamdigggers Association to exercise reasonable care while fueling aircraft to avoid spilling jet fuel into Boston Harbor.

27. Defendants breached their legal duty to plaintiff through negligently and carelessly fueling an aircraft, leading to a spill of jet fuel into Boston Harbor

28. Upon information and belief, plaintiff alleges that the spill was caused by the defendants' joint negligence in:

    a) "Jamming the dead man;"

    b) Failing to promulgate, implement, and enforce proper rules and procedures to ensure the safe fueling of aircraft at Logan Airport;

    c) Failing to properly supervise aircraft fueling operations at Logan Airport;

    d) Conducting fuel operations in such a manner that a spill occurred;

    e) Failing to timely bring the release under control;

    f) Failing to maintain a functioning fuel/water separator in the North Outfall;

    g) Acting in a careless and negligent manner; and

    h) Such other acts and omissions as will be shown at the trial of this matter.

29. As a result of this breach, plaintiff and other BCA members have been damaged through loss of income, loss of earning capacity, and in further respects that will be shown at trial.

## COUNT II
### GENERAL MARITIME LAW- PUNITIVE DAMAGES

30. Each and every allegation set forth above is realleged and reincorporated herein.

31. Defendants owed a duty to plaintiff and other members of Boston Clamdigggers Association to exercise reasonable care while fueling aircraft to avoid spilling jet fuel into Boston Harbor.

32. Defendants breached their legal duty to plaintiff, failed to exercise reasonable care, and acted with reckless, willful, and wanton disregard for the business and livelihood of others, including plaintiff and other clammers, in the negligent fueling of aircraft at Logan Airport.

33. Defendants knew or should have known that their wanton or reckless conduct would foreseeably result in a disastrous spill, causing damage to the economic interests of individuals and businesses who rely on natural resources in the area of the fuel spill.

34. As a direct and proximate result of defendants' wanton and reckless conduct, plaintiff and other clammers have suffered legal injury and damages, in an amount to be proven at trial, including but not limited to loss of livelihood, loss of income, and other economic loss.

35. Defendants' wanton or reckless conduct, as described herein, entitles plaintiff and clammers to punitive damages.

## COUNT III
### OIL POLLUTION ACT OF 1990

36. Each and every allegation set forth above is realleged and reincorporated herein.

6

37. OPA imposes strict liability upon a "responsible party for a…facility from which oil is discharged…into or upon navigable waters or adjoining shorelines" for the "damages that result form such incident." 33 U.S.C. §2702.

38. Defendants are "responsible parties" within the meaning of OPA.

39. Section 2701(b)(2)(C) provides for recovery of "[d]amages for subsistence use of natural resources, which shall be recoverable by any claimant who so uses natural resources which have been injured, destroyed, or lost, without regard to the ownership or management of the resources.

40. Section 2702(b)(2)(E) provides for the recovery of "[d]amages equal to the loss of profits or impairment of earning capacity due to the injury, destruction, or loss of…natural resources, which shall be recoverable by any claimant."

41. Massport is responsible for the North Outfall, which was the source of the fuel discharge to the harbor. Swissport is responsible for aircraft fueling activities at Logan Airport. Therefore they are jointly liable pursuant to Section 2702 for all the damages that result from the spill.

42. As a result of the spill, plaintiff and other BCA members have suffered the type of damages that may be recovered pursuant to OPA, and they demand compensation from defendants in amounts to be determined by the trier of fact.

## PRAYER FOR RELIEF

WHEREFORE the plaintiff and members of BCA demand judgment against defendants as follows:

1. A trial by jury as to all defendants;

2. Economic and compensatory damages in amounts to be determined at trial;

3. Punitive damages;

4. Pre-judgment and post-judgment interest at the maximum rate allowable by law;

5. Attorney's fees and costs of litigation;

6. Such other and further relief as the court deems proper.


For the plaintiff,
By his attorneys,


/s/ Brian Keane
Brian Keane, B.B.O. No. 656717
Christopher C. Storm, B.B.O. No. 680782
THE KAPLAN/BOND GROUP
88 Black Falcon Avenue, Suite 301
Boston, MA 02210
(617) 261-0080
bkeane@kaplanbond.com
cstorm@kaplanbond.com


Dated: October 3, 2013